RICHARD B. CARPENTER AND WIFE, AND HIRAM HUNTER, VS. JULIA McBRIDE, EXECUTRIX, ROBERT B. HAUGHTON, RICHARD H. BRADFORD, ADMINISTRATOR OF READ, AND JAMES M. HUNTER IN HIS OWN RIGHT, AND ADMINISTRATOR OF A. R. S. HUNTER, DECEASED.

Where a guardian or any other person acting in a fiduciary capacity, transfers an obligation securing the payment of money to a third person, and it is manifest on the face of the paper that minor heirs or *cestui que trusts* are interested in the fund secured to be paid, a Court of equity will follow the fund into the hands of the assignee, or interpose to prevent its payment to him. And this is done on the familiar and well established principle, that trusts are not only enforced against those persons who are rightfully possessed of the trust property as trustees, but against all persons who come into possession of the property bound by the trust with notice.

HAWKINS, J.

The complainants in this case come into Court and claim the proceeds of what is termed the McBride obligation, transferred by A. R. S. Hunter to Leigh Read, in part payment for lands and negroes sold by Read to Hunter. This instrument is in the following words:

## EXHIBIT F.

Condition of a bargain and sale made and entered into between Archibald R. S. and James M. Hunter, and A. R. S. Hunter, guardian of William H., Hiram S., and Grace Fenton Hunter, minor heirs of Adam Hunter, late of the County of Gadsden, deceased, of the one part, and Joseph McBride, of the County aforesaid, (all of the Territory of Florida) of the other part, witnesseth : That the said parties of the first part have sold to said McBride all the land, negroes, stock, and every other thing or things upon or belonging to said plantation and premises belonging to said estate, and hereby bind themselves in the sum of 20 thousand dollars to make or cause to be made to him good and sufficient titles to the property aforesaid, as soon as it can legally be done ; and said McBride shall give them (or deposit in the clerk's office) his notes (with security) for fourteen thousand dollars (deducting or settling what they may owe him) payable at the following times, viz : six thousand dollars on the 1st of May, 1839, two thousand on the 1st of May, 1840, two thousand the 1st of May, 1841, two thousand on the 1st of May, 1842, and two thousand on the 1st of May, 1843, all with interest from the 1st of May, next ; and said McBride binds himself in the sum of twenty thousand dollars to give or cause to be given the before described notes whenever the parties aforesaid shall make or cause to be made to him good and sufficient titles and bills of sale for the before descri-bed property. Witness our hands and seals this 30th day of January, A. D. 1838. Test, J. D. Edwards.

Signed,   A. R. S. HUNTER, [Seal.]

JAMES M. HUNTER, [Seal.]

ARCH. R. S. HUNTER, [Seal.]

Guardian for the Minors,

JOSEPH McBRIDE, [Seal.]

I hereby certify that A. R. S. Hunter has made me a deed to the land, which if I cannot get a legal title to the whole of the property, I am to deed back to him again. Witness my hand, this 3d April, 1838.   (Signed)  JOSEPH McBRIDE.

Test—H. Doggett,

  D. S. McBride.

They set forth in their bill that Grace F. and Hiram Hunter, are two of the children of Adam Hunter, deceased, and as such entitled

to a distributive share of the estate of their father—that on the 27th January, 1837, they were minors, and A. R. S. Hunter was at that time the guardian, and so continued until his death, in 1841. That a partition of the estate of their father was had, as will be seen by reference to the report of the commissioners upon the record, and that by this partition a separate and perfect title was made to said property. That on the 30th day of January, 1838, Joseph McBride purchased all the estate of their father, and gave the obligation as before set forth, never having executed the notes, but duplicate originals of it were retained by said McBride and by A. R. S. Hunter, their guardian. That said Hunter, on becoming indebted to Leigh Read, the intestate of R. H. Bradford, delivered, as they are informed that said Bradford contends, the said obligation to said Read as collateral security for certain notes, which said Read held against him. That they believe a part of said obligation had been paid to A. R. S. Hunter before it was delivered to Read, and further payments afterwards. That there is about six thousand dollars due still on said obligation. The whole obligation was then due in equal portions to the complainants, and their three brothers, A. R. S., James M., and William A. Hunter—the latter has since died without wife or child. That the whole of the money collected amounted to more than the shares of the three brothers and has been used by James M. and A. R. S. Hunter, and that complainants have never received any portion of the money due on said obligation. They now claim the balance due on said obligation, which they state is claimed by Bradford, administrator of Read, and charge that this balance belongs to them, being part of the consideration for which the property was sold. That on their coming of age they have made bills of sale of their portion of the said property to the executor of McBride.

The answers of Mrs. McBride and Haughton and the answer of James M. Hunter, admit the allegations of complainants' bill to be true, whilst that of Bradford, not denying the matters and things set forth in said bill, nevertheless insists that the McBride obligation belongs to the estate of Read, he having received it in his life time by regular transfer from A. R. S. Hunter, in part payment for the land and negroes purchased from him by Hunter for himself and the other heirs of Adam Hunter, and that therefore the bill is without equity.

The first question here is, had A. R. S. Hunter a legal right to transfer the obligation to Read so as to convey the interests of the complainants', at that time minors, and he their guardian ? It is un-- necessary to enter into an elaborate statement as to the duties which a guardian should perform to his wards. That subject was fully dis- cussed by the bench and the bar in the case of Williams vs. Mosely, 2 Florida Reports, 304. He can do nothing to prejudice his ward.. Considered as a trustee, he cannot alien the trust fund in payment of his own debt, 5 Rand., nor alter the destination of the fund for which it was originally intended. 4 Dess., 154. Hill vs. Simpson, 7 Ve- sey, 152. When a Court can pronounce a contract to be to the prejudice of the infant, it is void. Maule and Selwyn, 282. 2 Ma- son, 82. Chancellor Kent, speaking of the rights of guardians, uses this language : " Though it be not in the ordinary course of the guardian's administration to sell the personal property of his ward, yet he has the legal right to do it, for it is entirely under his control and management, and is not obliged to apply to this Court for direc- tion in every particular case." " The case of third persons dealing with executors and administrators in their representative character, is analagous and throws strong light on the subject." Lord Kenyon, the Master of the Rolls, admitted that in general, the purchaser from the executor, of the testator's assets, was not bound to see to the ap- plication of the money, but if upon the face of the assignment of the property it appeared to have been in satisfaction of a private debt of the executor, the sale was fraudulent against the persons interested under the will, and equity could relieve. The same doctrine is held in Scott vs. Tyler, Dickens, 712. And Lord Thurlow held that if one concerted with the executor to obtain the effects of an estate in extinguishing the private debt of the executor, or in any other man- ner, contrary to the duty of the office of executor, the purchaser would be liable. In Hill vs. Stephens, 7 Vesey, 152, Sir William Grant made a decree setting aside the transfer of assets by an executor to secure a debt of the executor under circumstances of gross negligence, though not of direct fraud in the creditor, to whom they were trans- ferred. The decisions in the above cases, are sustained by Chan- cellor Kent, who uses this language : " I have looked pretty fully into the decisions in the analagous case of a purchaser from an ex- ecutor of a testator's assets, and they all agree in this,. that the pur-

chaser is safe, if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact by the very transaction, applying them to the extinguishment of his own private debt." 7 John. Ch. Rep., 151, Field vs. Scheiffelin, et al.

It is superfluous to remark, that, under the circumstances of this case, Read was fully aware that the transfer of the McBride obligation to him was to pay a debt of Hunter, the guardian—that, on its very face, it contained notice of the fiduciary character of Hunter ; and the transfer to him being out of the ordinary duties of the guardian, he took the obligation at his peril, and was guilty of negligence in not ascertaining whether Hunter had the right to assign the obligation to him. Of course, we refer only to the interest of complainants secured by the obligation. It was a trust fund in the hands of Hunter, the guardian, and it is a familiar rule of Courts of Equity, that all persons acquiring property bound by a trust shall be considered as trustees. "If a trustee purchase property with the trust funds, there is a resulting trust for the *cestui que trust ;* so that he may either claim a beneficial right to the property, or at his election, claim a lien upon the property, for the security of the money invested in it ; and if the trustee sell, the purchaser from him, with notice of the trust, stands in the shoes of the trustee." Turner vs. Street, 2 Rand., 408. "Trusts are not only enforced against those persons who are rightfully possessed of the trust property as trustees, but against all persons who come into possession of the property bound by the trust, with notice of such trust." Adair vs. Shaw, 9 Sch. & Lefr., 262.

Even if this fund secured by the obligation has gone into the hands of Read, equity would follow it, and hold it subject to the claim of complainants ; and, *a fortiori*, will it restrain its taking the direction asked for by Read's administrator, unless there are equitable circumstances rendering it proper that it should do so ?

James M. Hunter says that there was no understanding that the Read property was purchased for the benefit of all the heirs, and does not know whether Hiram and Grace knew of the transfer of the McBride obligation, but is inclined to think that they did not know it at the time. But whether they knew of it or not is immaterial, as they were infants, and on their coming of age, they might affirm or disaf-

firm the transfer. James M. Hunter further says, that the complainants have never received from him, or his intestate, in property or money, any portion of the McBride obligation, and that it never was agreed between him and A. R. S. Hunter that he should pay complainants their share. The complainants cannot now look to the property purchased by A. R. S. Hunter, for their portion of the debt secured by the McBride obligation ; and though they might have recourse upon the bond of their guardian, still that is matter at their option, and they have a right to pursue the trust fund, that being the legitimate source from which they can derive payment. It is true the complainants, on obtaining their majority, affirmed the sale to McBride, but this cannot, by any means, be regarded as a confirmation of the transfer of the obligation, so far as their portion was concerned, to Read ; and, indeed, after a careful inspection of the record, we can see no act on their part that actually or impliedly ratifies this assignment by Hunter to Read, or that goes to show any intention on their part of relinquishing the claim upon the trust fund. Deeming their equities therefore in this behalf perfect and far superior to that of the estate of Read, we think that they should be the recipients of the balance of the proceeds arising from the McBride obligation, it appearing that this amount does not exceed the sum to which they are entitled as their share of that obligation.

The Court, therefore, directs the following judgment to be entered, to wit :

Be it remembered that this cause being heard upon a transcript of the record of Leon Circuit Court, by appeal from the decree rendered therein, and the same being fully considered by this Court, it is ordered, adjudged and decreed, that the decree of the Circuit Court of Leon County be, and the same is hereby, reversed. And this Court, proceeding to render such decree as should have been rendered in the Court below, doth further order, adjudge and decree, that complainants are entitled to the benefit of the decree heretofore rendered in this cause against Julia F. McBride, executrix of Joseph McBride, deceased, and Robert B. Haughton, on the 29th day of July, 1847, and that the proceeds thereof be paid to them, respectively, in equal portions ; and that complainants recover from Richard H. Bradford all their costs expended in this cause, and that said Bradford pay all the costs of this cause, incurred by reason of the appeal to this Court. 38